UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 20-23478-CIV-COOKE/GOODMAN

LUIS RAMOS,

      Plaintiff,

v.

KILOLO KIJAKAZI,
Commissioner of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATIONS ON SUMMARY JUDGMENT MOTIONS

This case challenges a denial of social security benefits. Plaintiff Luis Ramos and

Defendant Kilolo Kijakazi[1], Acting Commissioner of the Social Security Administration

("Commissioner"), filed cross-motions for summary judgment. [ECF Nos. 24; 25]. The

Commissioner's summary judgment motion also served as her opposition response to

Ramos' motion. [ECF No. 26]. Ramos filed a reply/response in opposition. [ECF No. 27;

28]. The Commissioner also filed a reply. [ECF No. 30]. According to the Clerk's directive

in these types of administrative appeals, all dispositive matters have been referred to the

Undersigned for a Report and Recommendations. [ECF No. 2].

---

[1]     Plaintiff's initial suit was brought against Andrew Saul, the Acting Commissioner
at the time of filing. Kilolo Kijakazi became the Acting Commissioner of Social Security
on July 9, 2021. Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi should
be substituted for Andrew Saul as the suit's Defendant.

As explained below, the Undersigned **respectfully recommends** that the District Court **deny** Ramos' summary judgment motion, **grant** the Commissioner's summary judgment motion, and enter a final judgment in favor of the Commissioner.

## I.      Procedural Background

On June 21, 2018, Ramos applied for supplemental security income, alleging a disability with an onset date of January 1, 2016. (R. 22; 200-05).[2] Ramos alleges disability due to epilepsy and "mental issues." (R. 222). The Commissioner denied the application initially and on reconsideration. (R. 99; 111). After a hearing on January 29, 2020 (R. 22), Administrative Law Judge Norman Hemming (the "ALJ") concluded that Ramos was not disabled. (R. 31). The Appeals Council denied review of the ALJ's decision. (R. 1-9). The Commissioner's final decision is now subject to review.

## II.      Factual Background

Ramos was 49 years old on the alleged onset date of January 1, 2016. (R. 30). Ramos has a General Equivalency Diploma (GED), is not fluent in English, and has not worked since 2005. (R. 44; 210; 222-23; 231). At the time of the hearing, Ramos lived with his sister and his parents in his sister's home. (R. 44). On a typical day, Ramos will take care of his hygiene, watch some TV, and take walks around the neighborhood. (R. 45).

Ramos claims disability due to epilepsy and mental issues. (R. 222).

---

[2]      Citations to ("R. __") refer to pages of the administrative record transcript. [ECF No. 22].

The medical records reviewed by the ALJ begin in 2017. (R. 27). By way of summary, Ramos' medical records reveal multiple examinations of Ramos' cognitive and physical abilities. (R. 27-30). Except for a singular assessment by Dr. Judith Siskind, Ramos' memory has been described, in most respects, as intact; his intelligence has been described as average; and he has reported varying levels of focus, depending on medication use. (R. 27-30).

Ramos last reported a seizure in 1997 and has since experienced only mild hand tremors (which were remedied) and a hard palate lesion (which was unlikely to be seizure related). (R. 27).

Dr. Siskind saw Ramos on two occasions and opined that Ramos is unable to work due to severe memory issues. (R. 29). State agency psychological consultants reached an opposite conclusion, opining Ramos had no medically determinable mental impairment. (R. 28).

Ramos explains that the lack of work makes him depressed. (R. 54). His sister compares caring for him to caring for an eight-year-old and believes he is unable to work due to his inability to follow directions. (R. 62; 64).

III.    **Applicable Legal Standards**

A.    *Standard of Review*

In evaluating a claim for disability benefits, an ALJ must follow the five steps outlined in 20 C.F.R. §§ 416.920(a) and 404.1520, which the Undersigned summarizes as

follows:

1. **Step one**. Is the claimant performing substantial gainful activity? If not, then an ALJ next determines:

2. **Step two**. Does the claimant have one or more severe impairments? If the claimant does, then an ALJ next considers:

3. **Step three**. Does the claimant have a severe impairment that meets or equals an impairment specifically listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled; if not, then an ALJ must determine the claimant's residual functional capacity ("RFC"); and then determine:

4. **Step four**. Based on the RFC, can the claimant perform his or her past relevant work? If so, then the claimant is not disabled. If the claimant cannot perform his or her past relevant work, then an ALJ must finally determine:

5. **Step five**. Based on the claimant's age, education, and work experience, and the RFC, can he or she perform other work? If so, then the claimant is not disabled. If not, then the claimant is disabled and entitled to benefits.

*See Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004).

The claimant bears the burden of proving that he is disabled within the meaning of the Social Security Act. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). In reviewing the decision, the Court must consider the record as a whole and determine whether the ALJ applied the correct legal standard and whether substantial evidence in the record supports her findings of fact. *Powers v. Heckler*, 738 F.2d 1151, 1152 (11th Cir. 1984). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Phillips*, 357 F.3d at 1240 n.8 (internal citation omitted). The Court "may not

decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal citation omitted). And "[i]f the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Id.* (internal citation omitted).

The Court is authorized to enter a judgment affirming, modifying, or reversing the decision of an ALJ, with or without remand. 42 U.S.C. § 405(g); *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1302 n.13 (11th Cir. 2000).

## IV. The ALJ's Findings

In denying Ramos' claim for benefits, the ALJ followed the sequential five-step evaluation process for social-security claims. (R. 24-31). At step one, the ALJ concluded that Ramos had not engaged in substantial gainful activity since June 21, 2018, the application date. (R. 24).

At step two, the ALJ concluded that Ramos had the following severe impairments: epilepsy, neurocognitive disorder, depression, and anxiety. (R. 24).

At step three, the ALJ concluded that Ramos did not have an impairment or combination of impairments classifiable as a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 24-26). Next, the ALJ determined that Ramos has the RFC to

> perform a full range of work at all exertional levels but with the following nonexertional limitations: Specifically, [Ramos] can never climb ladders, ropes, or scaffolds. [Ramos] can frequently handle objects, finger, or feel. [Ramos] can never work at unprotected heights or hazards. [Ramos] can

> never be exposed to noxious fumes, odors, or sensory irritants. [Ramos] can never drive. [Ramos] can apply commonsense understanding to follow simple one or two step instructions and can frequently interact with supervisors, coworkers, and the public.

(R. 26).

At step four, the ALJ concluded that Ramos has no past relevant work experience. (R. 30).

Lastly, at step five, the ALJ found that there are jobs existing in significant numbers in the national economy that Ramos can perform, including floor worker, machine feeder, and final assembler. (R. 30-31). Accordingly, the ALJ found that Ramos has not been under a disability from June 21, 2018, through the date of the ALJ's decision (February 11, 2020). (R. 31).

## V.     Analysis

Ramos raises multiple arguments in support of reversal. [ECF No. 23]. First, Ramos argues the testimony of the Vocational Expert ("VE") does not constitute substantial evidence upon which the ALJ could rely. *Id.* Ramos advances this argument via two alleged deficiencies in the VE's testimony: (1) two of the jobs provided by the VE involve "hazards," which the ALJ stated Ramos can never be around; and (2) the VE overstated the availability of final assembler jobs.

Second, Ramos argues the ALJ failed to properly evaluate the opinion of Dr. Siskind.

Third, he contends that the hypothetical the ALJ provided to the VE failed to

account for the ALJ's determination that Ramos suffered "moderate" limitations in his abilities to concentrate, persist, and maintain pace.

Fourth, Ramos argues that the ALJ failed to properly assess and weigh his claims about the severity of his symptoms.

For the reasons discussed below, the Undersigned rejects Ramos' arguments.

**A.    *The VE's Testimony Constituted Substantial Evidence Upon Which the ALJ Could Rely***

VEs are used by ALJs to determine if sufficient jobs exist in the national economy that the claimant can adjust to and perform. *Phillips*, 357 F.3d at 1240.

> A vocational expert is an expert on the kinds of jobs an individual can perform based on his or her capacity and impairments. When the ALJ uses a vocational expert, the ALJ will pose hypothetical question(s) to the vocational expert to establish whether someone with the limitations that the ALJ has previously determined that the claimant has will be able to secure employment in the national economy.

*Id.* An ALJ may rely solely on the testimony of a VE to make a step five determination that a claimant has the ability to find work in the national economy. *Mabrey v. Acting Comm'r of Soc. Sec. Admin.*, 724 F. App'x 726, 730 (11th Cir. 2018).

> 1. <u>The Term "Hazard" Does Not Include All Machines and Thus Does Not Prohibit Ramos From Working as a Floor Worker or Machine Feeder</u>

Ramos argues that the ALJ's finding that he could never work with "hazards" conflicts with the VE's testimony that Ramos can perform the jobs of floor waxer and machine feeder. This, he argues, necessitates reversal because, due to this conflict, the VE's testimony no longer constitutes "substantial evidence."

7

In support of his argument, Ramos directs the Court's attention to Form SSA-4732-BK, "Physical Residual Functional Capacity Assessment" ("PRFCA"). This is a form meant to standardize the SSA's data collection and ensure nationally consistent evaluations by the State Disability Determination Service. *See* Social Security Official Forms SSA-4734-BK (08-2017). Specifically, on page six of the form, the preparer is given an option to recommend limits to the claimant's exposure to "[h]azards (machinery, heights, etc.)." *See* PRFCA. Thus, Ramos claims that when the ALJ included in the RFC that "[Ramos] can never work at unprotected heights or with hazards," the ALJ explicitly precluded him from working with machinery.

Two of the jobs suggested by the VE, floor worker and machine feeder, include working with machinery. The tasks required for an individual employed as a floor worker include "[a]pply[ing] paste or liquid wax to floor with rags or machine and "[p]olish[ing] floor with electric polishing machine or weighted brush." 381.687-034 Waxer, Floor 1991 WL 673262 (Jan. 1, 2016). Likewise, a machine feeder must "[p]osition[] door frame parts between chain dogs on [a] conveyor that carries them under driving heads of [an] automatic nailing machine. 669.686-010 Automatic-Nailing-Machine Feeder 1991 WL 686066 (Jan. 1, 2016).

In response, the Commissioner argues that the Court should look to the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO") for the appropriate definition of "hazard." Social Security Ruling ("SSR") 96-9P

"explain[s] the Social Security Administration's policies regarding the impact of a [RFC] assessment for less than a full range of sedentary work on an individual's ability to do other work." SSR 96-9p (S.S.A.), 1996 WL 374185. Later, SSR 96-p's discussion on RFC limitations groups "hazards" under the subsection "[e]nvironmental restrictions" and provides the following examples: "moving mechanical parts of equipment, tools, or machinery; electrical shock; working in high, exposed places; exposure to radiation; working with explosives; and exposure to toxic, caustic chemicals." *Id.* The ruling also directs the reader to the "hazards" defined in the SCO. *Id.*

Appendix D of the SCO provides fourteen different "hazards" which fall under environmental limitations, including, in relevant part, "proximity to moving mechanical parts." U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993), Appendix D, SCODICOT App D (Westlaw). This subsection uses the same definition provided as an example in SSR 96-9P: "Exposure to possible bodily injury from moving mechanical parts of equipment, tools, or machinery." *Id.*

The Commissioner then highlights the fact that neither the jobs of floor worker nor of machine feeder require exposure to moving mechanical parts. *See* 1991 WL 673262 ("Moving Mech. Parts: Not Present - Activity or condition does not exist"); 1991 WL 686066 ("Moving Mech. Parts: Not Present - Activity or condition does not exist").

Ramos' response/reply argues that these definitions are not contrary to his

argument and that because SSR 96-9P and the SCO define hazards, in part, as "moving mechanical parts of equipment, tools, or machinery," that "machinery" and not just the moving mechanical parts of machinery, is still a hazard. Thus, the phrase, in Ramos' view, defines hazards as moving mechanical parts of equipment, *all* tools, or *all* machinery.

At the outset, the Undersigned rejects Ramos' reading of SSR 96-9P and the SCO's definition of "hazard." Correctly read, these publications define hazard, in part, as moving mechanical parts of equipment, moving mechanical parts of tools, *and moving mechanical parts of machinery*. *See California v. Brown*, 479 U.S. 538, 541-42 (1987) (Rehnquist, J., plurality) (deciding in a death penalty review that the term "mere" in the instruction-phrase "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" modifies more than the first noun, such that the instruction includes "mere sympathy").

Because this argument has been rejected, the Undersigned must next address what consideration, if any, the ALJ is required to give the phrases and terminology used in Form SSA-4732-BK. As the sole case supporting his argument that the ALJ erred in not resolving this purported conflict, Ramos cites *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1356 (11th Cir. 2018). *Washington* and its progeny establish the following relevant legal principles.

In *Washington*, the Eleventh Circuit concluded that under SSR 00-4p, "the ALJs within the SSA have an affirmative duty to identify apparent conflicts between the

testimony of a Vocational Expert *and the DOT* [the Dictionary of Occupational Titles, an authoritative publication by the DOL] and resolve them." *Washington*, 906 F.3d at 1356 (emphasis added).

Once an apparent conflict has been identified, the ALJ must "offer a reasonable explanation for the discrepancy, and detail in his decision how he has resolved the conflict." *Id.* A "failure to discharge this duty means that the ALJ's decision, when based on the contradicted VE testimony, is not supported by substantial evidence." *Id.*

An "apparent conflict" is

more than just a conflict that is made apparent by the express testimony of the VE. It is a conflict that is reasonably ascertainable or evident from a review of the DOT and the VE's testimony. At a minimum, a conflict is apparent if a reasonable comparison of the DOT with the VE's testimony suggests that there is a discrepancy, even if, after further investigation, that turns out not to be the case.

*Id.* at 1365.

In *Washington*, the conflict was "apparent" when the ALJ questioned the VE about available jobs for an individual capable of only occasional fingering. *Id*. The VE provided two jobs, which, under the DOT, required "frequent fingering." *Id*. Remand was appropriate because the ALJ's ruling failed to identify and resolve this apparent conflict, which was in violation of SSR 00-4p. *Id*.

To contrast, when there is no "apparent conflict," the ALJ has nothing to "identify, explain and resolve." *Washington*, 906 F.3d at 1356. In *Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315 (11th Cir. 2021), the Eleventh Circuit held there is no apparent conflict

between the terms "detailed but uninvolved" and "simple" when referring to instructional limitations. "Although there is potentially tension between [] simple instructions and [detailed but uninvolved instructions], that tension does not rise to the level of 'apparent' conflict as [the Eleventh Circuit has] defined it." *Id.* at *3 (citing *Washington*, 906 F.3d at 1366 (defining "apparent" as "reasonably ascertainable or evident")).

To comply with this standard, an ALJ is required to resolve conflicts only "between the VE's testimony and the DOT." *Webster v. Comm'r of Soc. Sec.*, 773 F. App'x 553, 555 (11th Cir. 2019). Ramos has not identified any competing authority burdening the ALJ with an independent, affirmative duty to resolve all possible internal inconsistencies in the VE's testimony.

Framed by the foregoing, Ramos' argument is unavailing for two reasons: (1) there is no *apparent* conflict which the ALJ was required to resolve; and (2) even if there were an apparent conflict, it was not between the VE's testimony and the DOT.

The foundational form justifying Ramos' belief that an unresolved apparent conflict exists is found in the Program Operations Manual System (POMS) of the SSA. The form does not serve as a reference guide nor is it a list of term definitions. Nor does the form reference any provision of 20 C.F.R. § 404.1, *et seq*. Instead, it is a suggested form designed to create standardized data collection amongst state evaluators.

Within POMS, however, there are sections which provide definitions. Specifically,

the Medical and Vocational Quick Reference Guide, provides information on "[t]erms relating to jobs or occupations that share the same definition that the Department of Labor uses in its publications, such as the: Dictionary of Occupational Titles (DOT); or Selected Characteristics of Occupations (SCO) defined in the DOT and words with a two-letter SCO acronym after them." POMS, DI 25001.001 Medical and Vocational Quick Reference Guide, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001 (last visited Nov. 1, 2021). In this reference guide, hazard is grouped under environmental conditions. *Id*.

In the section immediately following environmental conditions, POMS links to another section titled "environmental limitations." POMS then provides examples of environmental limitations, which includes the "[n]eed to avoid being near dangerous moving machinery." POMS, DI 25020.015 Environmental Limitations, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425020015 (last visited Nov. 1, 2021).

Thus, Ramos' argument, at best, relies on a single benign reference within an inapplicable document that appears to also be inconsistent with other documents present in the POMS database. The Eleventh Circuit has stated "'[a]pparent' means 'apparent to an ALJ who has ready access to and a close familiarity with the DOT.'" *Bacon v. Comm'r of Soc. Sec.*, -- F. App'x. --, 2021 WL 2566829, at *2 (11th Cir. June 23, 2021) (quoting *Washington*, 906 F.3d at 1366). Apparent conflicts must be "reasonably ascertainable or evident." *Id.*

13

This single reference is hardly reasonably ascertainable. Certainly, this is, in part, due to the fact that every other document, whether in POMS, the DOT, SSR, or 20 C.F.R. § 404.1, *et seq*, references hazard in the context of environmental restrictions, which are limited to either dangerous machinery or moving parts of machinery. Neither Ramos' initial motion nor his response directs the Court to any other source of this use of the term hazard other than this singular document utilized by claimants and state agency medical consultants. Because the large majority of sources -- and all sources whose purpose is to define terms -- support this more-particularized definition of hazard, even if there is a conflict, it is not apparent.

However, even if this document created an apparent conflict, the ALJ did not err in crediting the VE's testimony because the ALJ is required to resolve conflicts between only the VE and the DOT. *Webster* 773 F. App'x at 555. In fact, as Ramos notes in his motion, the basis for *Washington's* holding arises from SSR 00-4P. SSR 00-4P requires adjudicators, before relying on the testimony of a VE, to "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or [Vocational Specialists] and information in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO)." 2000 WL 1898704.

As argued by the Commissioner, the VE's testimony is consistent *with the DOT* and the SCO. Ramos' definition of hazard -- any and all machinery -- is not the definition

used by the DOT or the SCO. Therefore, in this regard, the VE's testimony constitutes substantial evidence.

2. The VE's Testimony About the Number of Final Assembler Jobs Constitutes Substantial Evidence Upon Which the ALJ Could Rely

Ramos next claims the data presented by the VE regarding the availability of final assembler jobs is substantially overstated. In support of this, Ramos details his *post-hearing* research into the job data discussed by the VE. He continues by positing *his own* theories, suggestions, and possible interpretations, and ultimately concludes that the VE, using unverified methodology, substantially overstated the number of final assembler jobs in the national economy.

"The Social Security Regulations provide that an ALJ may rely on a VE's knowledge and expertise, and they do not require a VE produce detailed reports or statistics in support of her testimony." *Bryant v. Comm'r of Soc. Sec.*, 451 F. App'x 838, 839 (11th Cir. 2012). Based on their knowledge and expertise, a "VE's testimony is therefore substantial evidence, as it is relevant evidence that a reasonable person would accept as adequate to support the conclusion that there is work available in significant numbers in the national economy that [the Claimant] is able to perform." *Curcio v. Comm'r of Soc. Sec.*, 386 F. App'x 924, 926 (11th Cir. 2010).

"[The Eleventh Circuit] has not placed an affirmative duty on the ALJ to independently investigate a conflict between the VE's testimony and job availability figure provided by the Bureau of Labor Statistics in the [Occupational Employment

Statistics].” *Id*. at 556. Thus, even when a VE's job numbers conflict with the job numbers provided by the Bureau of Labor Statistics, an ALJ has no duty to investigate or resolve this conflict.

For a situation like this, the analysis in *Davis v. Berryhill*, No. 17-cv-293-N, 2018 WL 2208432 (S.D. Ala. May 14, 2018) is instructive. In *Davis*, the claimant raised, in her motion before the district court (for the first time), statistics from “SkillTran” and an argument that the Occupational Employment Statistics group contained multiple DOT codes, not just the one for the job described by the VE. In denying the claimant relief, the *Davis* court noted:

> The only testimony regarding the source of the vocation expert's numbers is the following exchange:
>
> ALJ: And is your testimony consistent with the Dictionary of Occupational Titles?
>
> VE: With the exception of the reduction in numbers and that's based on my experience and familiarity with those types of jobs.

*Id.* at *6.

Here, like the claimant in *Davis*, Ramos did not ask any questions of the VE about her method of calculation or the data upon which she was relying. Instead, Ramos' only inquiries for the VE revolved around changing the hypothetical individual's conditions and abilities.

This can be contrasted by the actions of the claimant in *Goode v. Commissioner of Social Security*, 966 F.3d 1277 (11th Cir. 2020), a case relied upon by Ramos. Unlike the

claimant's actions here, the claimant in *Goode* cross-examined the VE at length:

> The record shows that Ms. Goode's attorney repeatedly questioned the vocational expert regarding his flawed testimony, expressing multiple times to the ALJ that he did not find the testimony persuasive or credible and was trying to get "specifics." Moreover, after several attempts to get an answer from the vocational expert, the ALJ intervened and urged the attorney to move on. This is not a case in which the claimant failed to challenge or question the vocational expert's methodology or job numbers. *See Shaibi v. Berryhill*, 883 F.3d 1102, 1110 (9th Cir. 2017) ("It is enough to raise the job numbers issue in a general sense before the ALJ. A claimant may do so by inquiring as to the evidentiary basis for a [vocational expert's] estimated job numbers[.]").

*Goode*, 966 F.3d at 1284 n.3.

The VE is not required to give statistics in support of his testimony. *Bryant*, 451 F. App'x 838, 839. Ramos is now asking the Undersigned to find fault with the ALJ's factual determinations. In assessing the ALJ's factual findings, the Court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (some alterations in original). This proscribed analysis is exactly the type with which Ramos is requesting this Court to engage.

Ramos argues that this Court should substitute the VE's unimpeached and uncontradicted testimony with his own research and speculation. To advance his position, he utilizes, as an example, the "equal distribution method" as a means of his post-hearing attack on the VE's testimony. By his own admission, however, *Chavez v. Berryhill*, one of the primary cases his argument rests on, criticizes this method as

"illogical" because its premise requires "an assumption about the relative distribution of jobs within a broader group that lacks any empirical footing." 895 F.3d 962, 966, 969-70 (7th Cir. 2018). With no empirical backing, it is just as likely the VE vastly understated the number of available jobs and each of the other 1,589 DOT occupations have only one available job and the "final assembler" positions account for 192,771 available jobs.

As the Eleventh Circuit has stated: "We review only whether the ALJ's decision was supported by substantial evidence, and 'we will look only to the evidence actually presented to the ALJ.'" *Valdez v. Comm'r of Soc. Sec.*, 808 F. App'x 1005, 1009–10 (11th Cir. 2020) (quoting *Falge v. Apfel*, 150 F.3d 1320, 1323 (11th Cir. 1998)). In *Valdez*, the Eleventh Circuit rejected the very argument Ramos is advancing and refused to consider post-hearing data in an attack on the VE's testimony about job availability. *Id.* at 1009.

A Court's review of an ALJ's decision is limited. The Court may not substitute its judgment for that of the ALJ. Nor is it appropriate to substitute the VE's uncontroverted testimony with Ramos' post-hearing speculation. The VE's expertise was stipulated to by Ramos at the hearing and his testimony constitutes substantial evidence upon which the ALJ could rely.

> **B.**     *The ALJ Did Not Inappropriately Discount Dr. Siskind's Opinions*

Ramos argues that the ALJ erred by failing to properly assess the opinion of Dr. Siskind. The Undersigned disagrees with this assessment. The ALJ appropriately evaluated the medical evidence in Ramos' case.

18

Because Ramos applied for benefits after March 27, 2017, the ALJ applied a new set of regulations for evaluating medical opinions and prior administrative medical findings, as set forth in 20 C.F.R. § 416.920c. The new regulations characterize evidence from Federal and State agency medical and psychological consultants as "prior administrative medical findings" instead of as medical opinions. 20 C.F.R. § 416.913(a)(5).

As a preliminary matter, under the new regulations, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a). In evaluating medical opinions and prior administrative medical findings, the SSA considers the following factors:

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3) Relationship with the claimant. This factor combines consideration of the issues in paragraphs (c)(3)(i)-(v) of this section.

(i) Length of the treatment relationship. The length of time a medical source has treated [a claimant] may help demonstrate whether the medical source has a longitudinal understanding of [a claimant's] impairment(s).

(ii) Frequency of examinations. The frequency of [a claimant's] visits with the medical source may help demonstrate whether the medical source

19

has a longitudinal understanding of [the claimant's] impairment(s).

(iii) Purpose of the treatment relationship. The purpose for treatment [a claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s).

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [a claimant's] impairment(s).

(v) Examining relationship. A medical source may have a better understanding of [a claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

(4) Specialization. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

(5) Other factors. [The SSA] will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding. This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements. When [the SSA] consider[s] a medical source's familiarity with the other evidence in a claim, [the SSA] will also consider whether new evidence [the SSA] receive[s] after the medical source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive.

20 C.F.R. § 416.920c(c)(1)-(5). The SSA prioritizes (c)(1), supportability, and (c)(2), consistency, when assessing the persuasiveness of any given medical opinion. 20 C.F.R. § 416.920c(a).

Ramos applied for benefits on June 21, 2018. (R. 22). Therefore, the new regulations apply. Ramos claims that the ALJ improperly discredited the opinion of Dr. Siskind, who saw Ramos on two occasions and performed memory and neuro psychological screenings. Ultimately, the ALJ found Dr. Siskind's opinion to be "not persuasive." (R. 29).

Dr. Siskind opined that Ramos' immediate memory (i.e., recalling spoken or visual information soon after receipt), delayed memory (i.e., recalling spoken or visual information with a half-hour delay), and working memory (i.e., attention and concentration abilities) were all seriously deficient. (R. 341). Dr. Siskind concluded that Ramos "has trouble 'absorbing' information to be recalled as well as in the subsequent effort to recall that information." *Id.* Ramos performed similarly poorly on an RBANS battery test, which measured his attention skills. *Id.*

The ALJ found that Dr. Siskind's assessments were "not well-supported by the contemporaneous treatment notes and are at variance with other evidence of record in material respects." (R. 29). The ALJ's decision highlights the following contradictory information:

(1) Dr. Horst's treatment notes from January 21, 2019, February 25, 2019, May 20, 2019, and June 25, 2019 state that Ramos' immediate and remote memory is intact. (R. 370; 386; 390; 393; 396).

(2) Dr. Omar Baez's (a neurologist) notes from July 24, 2018, October 16,

2018, and February 19, 2019 indicate that Ramos' remote memory was not impaired. (R. 312; 359; 419).

(3) Dr. Horst's treatment notes from February 25, 2019 indicates Ramos' intelligence was average. (R. 390).

(4) Dr. Horst's treatment notes from January 21, 2019 state Ramos is able to understand questions and his proverb interpretation and word definition were unimpaired. (R. 370).

(5) Ramos self-reports he does not have problems getting along with others. (R. 250).

(6) Dr. Baez opined on July 24, 2018 and October 16, 2018 that Ramos has normal language skills. (R. 312; 359). Dr. Kamil Detyniecki's notes from July 12, 2019 also noted appropriate mood. (R. 409).

(7) Dr. Horst's treatment notes from January 21, 2019, February 25, 2019, May 20, 2019, and June 25, 2019 state that Ramos' insight and judgment were fair. (R. 386; 390; 393; 396).

(8) Dr. Horst also noted that Ramos' treatment was effective, and Ramos reported feeling less preoccupied and also reported sufficient focus. (R. 395; 398).

(9) Last, Dr. Horst's treatment notes from January 21, 2019, February 25, 2019, May 20, 2019, and June 25, 2019 state that Ramos' demonstrated a

logical and organize thought process. (R. 386; 390; 393; 396).

Ramos urges this Court to find the ALJ erred in discounting Dr. Siskind's cognitive testing. He asks this Court to declare these contradictory medical records as "benign" and instead look to the extensive testing by Dr. Siskind, which he characterizes as clinically significant. [ECF No. 24]. While Dr. Siskind's testing may be valid and may be consistent with Ramos' hearing testimony, the inquiry for this Court is not whether there is evidence contradictory to the ALJ's findings, it is whether there is substantial evidence supporting the ALJ's factual findings. *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991) ("Even if we find that the evidence preponderates against the [ALJ's] decision, we must affirm if the decision is supported by substantial evidence.").

Ramos cites the "recent" case, *Castro v. Acting Comm'r of Soc. Sec.*, 783 F. App'x 948 (11th Cir. 2019), for the proposition that an ALJ does not have "good cause" to discount a treating physician's opinion about a claimant's ability to work based on the same physician's contradictory findings in clinical notes. However, Ramos fails to note the *Castro* Court's analysis is based on C.F.R. § 416.927, which governs claims filed *before* March 27, 2017.

As the Commissioner correctly notes, the revised regulations explicitly **remove** the "treating source rule" which requires a certain level of deference to a claimant's treating physician. *Compare* 20 C.F.R. § 416.920c *with* C.F.R. § 416.927. Without the required deference, Dr. Siskind begins on a level playing field with the other doctors, whose

opinions the ALJ also considered.

In Ramos' reply, he quotes a passage from *Simon v. Comm'r of Soc. Sec.*, 7 F.4th 1094, 1104 (11th Cir. 2021),[3] in which the appellate court states, "our own case law is clear that a treating physician's conclusion must be given substantial or considerable weight unless there is good cause to discount them."

Ramos mentions that the appellate court acknowledges in a footnote that the SSA has removed the controlling weight provision of its rules. However, he incorrectly attributes the proposition "the instructions still instruct an ALJ to weigh treating medical opinions in the light of the length of [the] treatment relationship and the extent of the treatment relationship" to the same footnote and argues this means the ALJ must still have good cause.[4]

What Ramos fails to mention is that the Eleventh Circuit acknowledges the change in regulations:

Claims filed after that date are governed by a new regulation prescribing a

---

[3]      On petition for rehearing, the Eleventh Circuit withdrew its prior opinion, 1 F.4th 908 (11th Cir. 2021), and issued this opinion in its stead.

[4]      A review of the Eleventh Circuit's withdrawn decision reveals this language was originally present in footnote 4. *Simon*, 1 F.4th 908, 918 n.4. However, the withdrawn decision was issued on June 9, 2021 and Ramos' motion specifically cites to the August 12, 2021 decision, which has removed the quote that Ramos bolded and italicized to emphasize its importance.

The fact that the Eleventh Circuit felt the need to alter this provision suggests that Ramos' claim that the "good cause" standard has assuredly been unimpacted by the SSA's new regulation is not as open and shut as is argued.

somewhat different framework for evaluating medical opinions. See 20 C.F.R. § 404.1520c. Because Simon filed his claim in March of 2015, we need not and do not consider how the new regulation bears upon our precedents requiring an ALJ to give substantial or considerable weight to a treating physician's opinions absent good cause to do otherwise.

*Simon*, 7 F.4th 1094, 1104, n.4. Thus, the Eleventh Circuit has left open the question of whether the "good cause" requirement is still applicable under the SSA's new framework.

Ramos argues, however, that the "good cause" and "treating physician" rules were formulated independent of the SSA regulations and are, therefore, applicable regardless of whether the SSA has promulgated new rules or standards. In support of this, Ramos cites *Hillman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986), which held that a treating physician's opinion must be given substantial weight and was decided well before the SSA adopted the treating physician rule in 1991. Therefore, Ramos claims, "[j]ust as the weight given to a treating physician was to be given substantial weight before the adoption of the treating physician rule in the 11th Circuit, it also must be given substantial weight after the rescinding of the treating physician rule in 2017." [ECF No. 27] (emphasis removed).

However, as the Commissioner correctly notes, the decisions prior to the SSA's promulgation of the treating physician rule did not hold that this standard was required by the Act or the Constitution, "[r]ather, the courts of appeals have articulated their treating physician precedent in the *absence* of a definitive regulation by the Secretary." 56

Fed. Reg. at 36,934 (emphasis added); *see also Schisler. Heckler*, 787 F.2d 76 (2d Cir. 1986) (ordering attorneys representing the SSA to inform its adjudicators that this rule was in fact SSA policy because the current regulations were silent on the issue).

Ramos has not argued that the 2017 revision to the regulations was arbitrary, capricious, or exceeded the Commissioner's rulemaking authority so the Court will not address the underlying validity of the 2017 revision and will, instead, analyze only its practical impact on the case at hand. To summarize the background, when the SSA's regulations were silent as to the weight of a treating physician's testimony, the Eleventh Circuit (and many circuits throughout the country) held the weight is "substantial" and an ALJ must have "good cause" to discount it and, after the SSA revised the regulations, codifying this standard, the Eleventh Circuit continued to apply this analysis.

Currently, however, the SSA regulations explicitly state, "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c(a). Ramos argues this change has no impact on the Eleventh Circuit's prior opinions and the Commissioner argues it is entitled to deference and the new rules render prior case law, interpreting former iterations of the regulations, inapplicable.

The Undersigned agrees with the Commissioner's position.

42 U.S.C. § 901 establishes the Social Security Administration as an independent agency in the executive branch of the Government. 42 U.S.C. § 901(a). The purpose of the Administration is to "administer the old-age, survivors, and disability insurance program. . . and the supplemental security income program." 42 U.S.C. § 901(b). The Commissioner is granted the general authority to "prescribe such rules and regulations as the Commissioner determines necessary or appropriate to carry out the functions of the Administration." 42 U.S.C.A. § 902(a)(5). In the context of administrative determinations, findings of fact, and evidentiary hearings:

> The Commissioner of Social Security shall have full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations *to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same* in order to establish the right to benefits hereunder.

42 U.S.C.A. § 405(a) (emphasis added).

The rules, regulations, and procedures established by the Commissioner are entitled to judicial deference. *Barnhart v. Walton*, 535 U.S. 212, 225 (2002) ("The statute's complexity, the vast number of claims that it engenders, and the consequent need for agency expertise and administrative experience lead us to read the statute as delegating to the Agency considerable authority to fill in, through interpretation, matters of detail related to its administration."). The Supreme Court laid the groundwork for analyzing policies of administrative agencies, stating:

> 'The power of an administrative agency to administer a congressionally
> created ... program necessarily requires the formulation of policy and the
> making of rules to fill any gap left, implicitly or explicitly, by Congress.'
> *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974).
> If Congress has explicitly left a gap for the agency to fill, there is an express
> delegation of authority to the agency to elucidate a specific provision of the
> statute by regulation. Such legislative regulations are given controlling
> weight unless they are arbitrary, capricious, or manifestly contrary to the
> statute. Sometimes the legislative delegation to an agency on a particular
> question is implicit rather than explicit. In such a case, a court may not
> substitute its own construction of a statutory provision for a reasonable
> interpretation made by the administrator of an agency.

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984). In future

administrative law opinions, this form of judicial deference has become known as

"*Chevron* deference."

Ramos put forward no evidence that the 2017 revision is not entitled to controlling

weight because it is arbitrary, capricious, or manifestly contrary to the statute. His only

argument is that prior Eleventh Circuit precedent addressing regulations either *silent* on

the issue of weight afforded to medical opinions or *explicitly adopting* a "treating source"

preference should still, somehow, control in the face of a regulation *explicitly precluding*

an ALJ from automatically affording a treating source preferential weight. This argument

is unavailing.

The Supreme Court has held that "prior judicial construction of a statute trumps

an agency construction otherwise entitled to *Chevron* deference *only if* the prior court

decision holds that its construction follows from the unambiguous terms of the statute

and thus leaves no room for agency discretion." *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).

The Eleventh Circuit caselaw interpreting former iterations of the relevant regulation (whether before or after 1991) did not originate from the unambiguous terms of 42 U.S.C.A. § 902; rather, it originated from a void in the original regulations and a no-longer-existing revision which mirrored its prior interpretations. The mere fact that the pre-2017 amendment reflected already-existing judicial precedent does not mean that the Commissioner was barred from later promulgating rules differing from the prevailing judicial interpretations of the regulations. *See Satellite Broad. & Commc'ns Ass'n of Am. v. Oman,* 17 F.3d 344, 347 (11th Cir. 1994) (courts must follow valid rules "notwithstanding circuit precedent to the contrary.")

Applying these principles, Ramos' argument that the 2017 revision must yield to judicial precedent has been rejected by courts throughout the country. *See e.g., Douglas v. Saul*, No. 4:20-CV-00822-CLM, 2021 WL 2188198, at *4 (N.D. Ala. May 28, 2021) (holding that because the SSA's 2017 revision is entitled to *Chevron* deference, "the court will apply the 2017 regulations—not the treating physician rule—to the ALJ's evaluation of the opinion evidence"); *Dany Z. v. Saul*, No. 2:19-CV-217, -- F.Supp.3d --, 2021 WL 1232641, at *10 (D. Vt. March 31, 2021) (applying the 2017 revision despite prior Second Circuit precedent requiring treating source preference); *Jones v. Saul*, No. 2:19-CV-01273 AC, 2021 WL 620475, at *8-10 (E.D. Cal. February 17, 2021) (rejecting contention that court must

apply Ninth Circuit's treating source rule because it pre-dates the SSA's formal adoption of the rule); *Patricia F. v. Saul*, No. 19-5590-MAT, 2020 WL 1812233, at *4 (W.D. Wash. Apr. 9, 2020) (holding *Chevron* deference requires court to defer to 2017 revision despite long standing Ninth Circuit case law requiring a preference for treating sources).

Therefore, the Undersigned evaluates the ALJ's decision to see if, guided by 20 C.F.R. § 416.920c, there is substantial evidence supporting the ALJ's determination that Dr. Siskind's opinion was not persuasive.

The ALJ, in evaluating Dr. Siskind's opinion, considered the supportability and consistency of her findings. *See* 20 C.F.R. § 416.920c ("The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability … and consistency ….") As detailed above, the ALJ noted discrepancies regarding Ramos' intelligence, intact memory functioning, and focus. (R. 26-30). These are all areas where various treatment records reflected Ramos' abilities as average or otherwise unremarkable, in contrast with Dr. Siskind, who opined Ramos was in the bottom 1-4% of every memory-based category. (R. 341).

Ramos argues that the ALJ's decision is not supported by substantial evidence because the ALJ summarized Dr. Siskind's findings in one sentence, stating, "[t]he testing revealed impaired memory and attention skills." (R. 28). Ramos describes the testing for

approximately two pages in his reply and believes that the ALJ's succinct summary is evidence his "fail[ure] to properly assess the cognitive testing results." [ECF No. 27].

The ALJ, however, is not required to cite "particular phrases or formulations" in making a credibility determination. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005); *see also Wilkinson v. Comm'r of Soc. Sec.*, 289 F. App'x 384, 386 (11th Cir. 2008) ("The ALJ was not required to list in detail every bit of evidence he relied on to reach [a] decision."). Instead, the ALJ must simply provide more than a broad rejection which renders the reviewing court unable to determine if the ALJ considered the record as a whole. *Id.*

The ALJ's decision indicates he reviewed the medical records as a whole. In his discussion of Dr. Siskind's opinion's inconsistencies with the other medical evidence, the ALJ demonstrates his knowledge of Dr. Siskind's findings (because he is able to point why other medical evidence is contrary to Dr. Siskind's conclusions). The ALJ's assessment of Dr. Siskind's opinion is supported by substantial evidence and he did not err in finding the opinion not persuasive. *See, e.g. Phelps v. Kijakazi*, No. 20-cv-1572, 2021 WL 4473134, at *5 (M.D. Fla. Sept. 30, 2021) ("[N]oting the inconsistencies between Dr. Nelson's opinion and his own records, which goes to the supportability factor, and the conflicts between Dr. Nelson's opinion and Dr. Arumugam's examination, which goes to the consistency factor."); *Cortes v. Saul*, No. 20-14125, 2021 WL 3622102 (S.D. Fla. July 19, 2021) (ALJ properly discounted doctor's opinion based on a finding it was inconsistent with treatment notes).

C.     *The ALJ's RFC Finding is Supported by Substantial Evidence*

According to Ramos, the ALJ committed error by failing to account for his step three limitations in assessing Ramos' RFC. Because of this purported error, the ALJ presented the VE with, what Ramos characterizes as "an innately flawed hypothetical . . . that did not incorporate all of the functional limitations that would reasonably be supported by the record which related to Ramos's conditions." [ECF No. 24]. Therefore, Ramos argues, the VE's testimony cannot constitute substantial evidence upon which the ALJ could rely.

The Commissioner responds that the ALJ's review of the evidence was "more than legally sufficient" and "[h]is RFC finding included those mental limitations he ultimately found supported -- limitations to applying commonsense understanding to follow simple one and two-step instructions and frequent interaction with supervisors, coworkers, and the public." [ECF No. 25].

Both parties cite *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176 (11th Cir. 2011) in support of their respective arguments, although the Commissioner adds additional decisions beyond *Winschel*. In *Winschel*, the Eleventh Circuit reversed and remanded an ALJ's decision because "the ALJ asked the vocational expert a hypothetical question that failed to include or otherwise implicitly account for all of Winschel's impairments." 631 F.3d at 1181. Specifically, while the "ALJ determined at step two that Winschel's mental impairments cause a moderate limitation in maintaining concentration, persistence, and

pace," the ALJ did "not indicate that medical evidence suggested Winschel's ability to work was unaffected by this limitation, nor did he otherwise implicitly account for the limitation in the hypothetical." *Id.*

Just as the ALJ did here, the ALJ in *Winschel* posed a hypothetical that limited the claimant to simple, routine tasks or unskilled work. While the deficient hypothetical was cause for a remand in *Winschel*, use of the same hypothetical is not necessarily fatal in every case. The *Winschel* Court required the explicit inclusion of the limitation to concentration, persistence, and pace to be included in the ALJ's hypothetical because "the ALJ did not indicate that medical evidence suggested Winschel's ability to work was unaffected by this limitation, nor did he otherwise implicitly account for the limitation in the hypothetical." *Id.*

 In contrast, the Eleventh Circuit rejected this type of argument in *Szilvasi v. Comm'r, Soc. Sec. Admin.*, 555 F. App'x 898, 902 (11th Cir. 2014) because the ALJ in Szilvasi's case "clearly considered the medical evidence regarding all of Szilvasi's limitations before finding that he could complete simple routine tasks." The *Szilvasi* Court noted that the ALJ discussed the doctor's findings, which justified finding that the "ALJ made an independent determination that Szilvasi retained the ability to 'perform simple, repetitive tasks with superficial interaction with others.'" 555 F. App'x at 902.

Likewise, in *Lee v. Comm'r, Soc. Sec. Admin*, 551 F. App'x 539, 541 (11th Cir. 2014), the ALJ considered the medical evidence and "adequately accounted for all of Lee's

impairments in the hypothetical posed to the VE because he implicitly accounted for Lee's limitations in concentration, persistence, and pace when he imposed a limitation of simple work." Similarly, in *Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869, 872 (11th Cir. 2011), the ALJ's decision was affirmed because the restriction to simple instructions and simple tasks in the hypothetical properly accounted for limitations to concentration, persistence, and pace because, the medical evidence demonstrated the claimant could follow simple instructions and complete simple tasks.

Here, the ALJ's RFC, hypothetical, and assessment of the medical evidence is more in line with *Lee*, *Jarrett*, and *Szilvasi* and is easily distinguished from *Winschel*. The following excerpts highlight the ALJ's consideration of Ramos' mental impairments and medical records in deciding his RFC.

Before issuing his RFC the ALJ notes that "[t]he following [RFC] assessment reflects the degree of limitation I have found in the 'paragraph B' mental function analysis." (R. 26). By stating this, the ALJ has acknowledged that he has considered and incorporated his prior findings into his ultimate RFC determination.

Within the RFC, the ALJ made various statements and observations elaborating on the foundation of the RFC: (1) the ALJ stated he considered all symptoms and medical opinions in making his findings (R. 26); (2) in discussing Ramos' testimony, said that the clinical and diagnostic findings do not support a more restrictive functional limitation (R. 27); (3) in discussing the State psychological consultants, detailed their findings and said

they did not support a more restrictive mental limitation than discussed (R. 28-29); and (4) throughout the findings, the ALJ discussed how medical records described Ramos as "alert," "able to comprehend questions," possessing fair judgment and insight, having "sufficient focus," and demonstrating a "logical and organized thought process."

While the ALJ does not explicitly state that he considered Ramos' limitations to concentrating, persisting, or maintaining pace, he did state that he was considering the section in which the limitations were described, he adequately described and considered the medical records, and he correctly categorized the assessments as relating to Ramos' mental impairments. Because of this, neither the ALJ's hypothetical nor the RFC were deficient and there is no basis to reverse and remand on this ground.

### D.   *The ALJ Properly Weighed Ramos' and His Sister's Testimony*

Ramos' final argument stems from his claim that the ALJ improperly discounted his hearing testimony about the extent of his disabilities and limitations. [ECF No. 24]. The Commissioner states the ALJ was justified in declining to defer to Ramos' subjective complaints. [ECF No. 25].

In support of his position that the ALJ's rejection of his testimony was not in accord with the SSA's governing rules, Ramos cites Social Security Ruling 16-3p. His argument is essentially a recitation of the two-step framework an ALJ must apply when evaluating "impairment related symptoms." Ramos doesn't explain *how* the ALJ failed in applying this framework and he simply ends with a conclusory allegation that his self-reported

symptoms are consistent and "his allegations of disabling impairments should not have been discounted to the extent the ALJ did so in the crafting of his rationale." [ECF No. 24].

Ramos appears (without explicitly so stating) to rely on Social Security Ruling 16-3p's provision which states, "[the ALJ] will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." A review of the record reveals the ALJ did not disregard Ramos' statements on this impermissible basis.

There is a difference between evidence which does not substantiate and evidence which *contradicts*. The ALJ specifically provided the following summaries of his extensive analysis of Ramos' contradictory medical records:

> I find that the claimant's medically determinable impairments could reasonably be expected to produce the above alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record.
>
> * * *
>
> [T]he overall evidence does not support the level of symptom intensity, persistence, and functionally limiting effect alleged by the claimant. Towards that end, I note the claimant has not received the type of treatment one would expect from a totally disabled individual. Specifically, the lack of aggressive treatment suggests the claimant's symptoms and limitations were not as severe as alleged. Additionally, the claimant's seizures were characterized as controlled, and his mental status improved with only medication management.

* * *

Even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in the view of the relatively weak medical evidence and other factors discussed in this decision.

(R. 27-30) (internal citations omitted).

An ALJ is permitted to discredit a claimant's allegations of completely disabling symptoms, provided that the ALJ "articulate[s] explicit and adequate reasons" for so doing. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). "The question is not . . . whether [the ALJ] could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935 (11th Cir. 2011). The ALJ's reasons for discounting Ramos' testimony were plenary and he was not "clearly wrong" in finding Ramos' self-serving statements lacked support and were, in fact, contradicted by the objective medical treatment records. *Maddy v. Berryhill*, No. 17-80150, 2018 WL 1863610, at *4 (S.D. Fla. Mar. 23, 2018) (holding it was appropriate for ALJ to discount claimant's statements when it was inconsistent with the claimant's conservative treatment, intermittent reports of pain, and noted improvement in some areas with treatment).

For these reasons, there is no basis for remand on this issue.

## VI. Conclusion

The Undersigned **respectfully recommends** that the District Court **deny** Ramos' summary judgment motion, **grant** the Commissioner's summary judgment motion, and

enter final judgment in favor of the Commissioner.

## VII.    Objections

The parties will have 14 days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within 14 days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary in the interests of justice. *See* 29 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, Miami, Florida, on November 9, 2021.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to**:
The Honorable Marcia G. Cooke
All counsel of record